IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-CR-54-WKW |
| | ) | [WO] |
| JOSHUA DRAKE HOWARD | ) | |

## MEMORANDUM OPINION AND ORDER

This motion asks whether the Government gets one free day to electronically track a borrowed truck with a GPS tracking device without a warrant. The Supreme Court's long-standing directive that the Fourth Amendment does not apply to a car's movements on public roads is in apparent conflict with its recent attempt to adapt the Amendment to twenty-first-century fears that Big Brother is watching. While courts are no doubt called to extend new protections to new technologies, established constitutional limits are binding so long as they remain the rule of law. Therefore, the motion to suppress is due to be denied.

On August 26, 2019, the Magistrate Judge filed a Recommendation (Doc. # 50) that the motion to suppress filed by Defendant Joshua Drake Howard (Doc. # 28) be denied. Defendant timely objected to the Recommendation. (Doc. # 61.) Upon a *de novo* review of the record and the Recommendation, Defendant's objections relating to the GPS tracking of his borrowed vehicle and relating to

reasonable suspicion for his February 22, 2018 stop (Doc. # 61, at 5–14) are due to be overruled and the Recommendation adopted with modifications. His objection relating to his July 13, 2018 stop (Doc. # 61, at 14–15) is due to be overruled and the Recommendation adopted without modification. The Recommendation's findings of fact and its conclusions of law regarding installation of the GPS device and probable cause to search the truck (Doc. # 50, at 2–6, 7–10, 19–20) are due to be adopted without modification.

## I. STANDARD OF REVIEW

When a party objects to a Magistrate Judge's Report and Recommendation, the district court must review the disputed portions *de novo*. 28 U.S.C. § 636(b)(1). The district court "may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions." Fed. R. Crim. P. 59(b)(3). *De novo* review requires that the district court independently consider factual issues based on the record. *Jeffrey S. ex rel. Ernest S. v. State Bd. of Educ.*, 896 F.2d 507, 513 (11th Cir. 1990). If the Magistrate Judge made findings based on witness testimony, the district court must review the transcript or listen to a recording of the proceedings. *Id*. The district court cannot reject a credibility determination without rehearing live testimony. *United States v. Powell*, 628 F.3d 1254, 1257 (11th Cir. 2010). But the district court may, without a new hearing,

modify findings in a way consistent with the Magistrate Judge's credibility determination. *See Proffitt v. Wainwright*, 685 F.2d 1227, 1240–41 (11th Cir. 1982).

## II. FACTUAL HISTORY

This case involves two automobile stops: one in a parking lot in Headland, Alabama (a suburb of Dothan, Alabama), on February 22, 2018, and one along a roadway in Dothan on July 13, 2018. The Recommendation adequately recites the facts, but some will be repeated or summarized here for clarity.

On February 20, 2018, Investigator Joshua Tye of the Dothan Police Department arrested a woman for possession of methamphetamine and secured her agreement to cooperate with the Department on other unspecified cases. On February 21, 2018, Investigator Tye's superior, Corporal Krabbe, informed Tye that he had received information from his own confidential informant ("CI") that Joshua Drake Howard was "possibly traveling to Phenix City that day or that night to pick up a large amount of methamphetamine." (Doc. # 42, at 4–6, 37); (Doc. # 38, Def. Ex. 2, at 1.) On the same day, Investigator Tye contacted his new informant, who confirmed that she knew Mr. Howard to be a meth distributor and agreed to contact Mr. Howard for more information. The CI soon contacted Investigator Tye and informed him that Mr. Howard "was going to the Phenix City area to pick up methamphetamine" that day and that he asked to borrow her truck. (Doc. # 42, at 7–8.)

At Investigator Tye's request, the CI consented to the Dothan Police Department placing a GPS tracker on her truck on February 21, at 2:37 p.m. (Doc. # 42, at 8–9); (Doc. # 38, Gov. Ex. # 4.) Mr. Howard took possession of the truck roughly two hours later, at which point Investigator Tye began monitoring the GPS device. The GPS device transmitted the truck's location every five seconds while the truck was in motion. (Doc. # 42, at 11–12); (Doc. # 38, Def. Ex. # 3.) Around 7:30 p.m., Investigator Tye personally confirmed that the truck was parked at the first location where it stopped, but he did not see Mr. Howard. (Doc. # 42, at 12–14, 28–29.) Investigator Tye monitored the GPS device's movements—but conducted no visual surveillance—over the next (roughly) nineteen hours as the truck made several stops, including in Phenix City, and then began driving back toward Dothan. (Doc. # 42, at 13–16.)

As Mr. Howard neared Dothan around 2:00 p.m. on February 22, 2018, Investigator Tye decided to intercept the truck in Headland. His fellow officers confirmed that Mr. Howard was driving the CI's truck at this time. Mr. Howard stopped and ate in a Hardee's parking lot, at which time Investigator Tye approached the truck, told Mr. Howard to step out, and saw a handgun in the driver's door map pocket. Investigator Tye then patted Mr. Howard down; found meth on his person; and found a larger bag containing meth, paraphernalia, ammunition, and another gun in the bed of the truck. (Doc. # 42, at 15–21.) Mr. Howard was transported to the

police station, where he waived his *Miranda* rights and made incriminating statements. (Doc. # 38, Def. Ex. # 2, at 3.)

Less than five months later, on July 13, 2018, Corporal Clifton Overstreet of the Dothan Police Department stopped Mr. Howard for crossing over "a solid yellow line into the beginning of a turn lane for oncoming traffic" and for "failing to signal before getting into the turn lane or before getting within 100 feet of making a left turn." (Doc. # 50, at 5); (Doc. # 42, at 44–45.) "A computer search revealed that Mr. Howard had active arrest warrants. As a result, he was arrested, and the contents of his vehicle were inventoried. The inventory search of the vehicle revealed a firearm with an obliterated serial number." (Doc. # 61, at 4.)

Mr. Howard challenges one of the Recommendation's findings of fact—that Mr. Howard committed a traffic violation before being stopped on July 13, 2018. Because this finding is closely entwined with the Recommendation's legal conclusion relating to that stop, it is discussed in Section III.C. The Magistrate Judge's findings of fact with respect to that traffic violation are due to be adopted.

## III. DISCUSSION

Mr. Howard objects to the Magistrate Judge's conclusions that (1) he lacked a reasonable expectation of privacy in his movements while operating the borrowed truck, (2) Investigator Tye had reasonable suspicion to stop his vehicle on February 22, 2018, and (3) Corporal Overstreet had reasonable suspicion to stop his vehicle

on July 13, 2018.  (Doc. # 61.)  Concluding that the GPS monitoring and related stop were lawful, the court need not reach Mr. Howard's fourth objection that his incriminating statements on February 22, 2018, should be excluded as the fruit of an illegal search and/or seizure.  (Doc. # 61, at 14.)  Additionally, this opinion will only address those portions of the Recommendation to which Mr. Howard has objected. All unobjected-to portions of the Recommendation—namely its legal conclusions relating to the February 21 installation of the GPS device and probable cause to search the truck (Doc. # 50, at 7–10, 19–20)—are due to be adopted without further discussion.

A.     **The Dothan Police Department's monitoring of the GPS tracker attached to Mr. Howard's borrowed truck was not a search.**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV.  Thus, there must be a "search" or a "seizure" to trigger the Fourth Amendment's protections.  Mr. Howard argues that he was searched because he had a reasonable expectation of privacy in his movements while operating the borrowed truck.  (Doc. # 61, at 6.)  Under the principles set forth in *United States v. Knotts*, 460 U.S. 276 (1983), Mr. Howard did not have a reasonable expectation of privacy, so no search occurred.  The simplicity of that conclusion fails to capture the complexity of getting there.

1.

As the Recommendation noted, a Fourth Amendment quandary awaits the reader.  Seven years ago, the United States Supreme Court in *United States v. Jones* declared that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements" for twenty-eight days, "constitutes a 'search.'"  565 U.S. 400, 404 (2012).  This would be a closed case if that Court had found that all GPS vehicle monitoring violated a suspect's reasonable expectation of privacy, a doctrine which has ostensibly been the "lodestar" test of Fourth Amendment analysis for the past fifty-two years.  *See Katz v. United States*, 389 U.S. 347, 360–61 (1967) (Harlan, J., concurring) (suggesting that government intrusion into an area where an individual has a reasonable expectation of privacy is a search); *Smith v. Maryland*, 442 U.S. 735, 739 (1979) (declaring *Katz* to be the "lodestar" when "determining whether a particular form of government-initiated electronic surveillance is a 'search'").

Instead, Justice Scalia's majority opinion in *Jones* revived the Fourth Amendment's traditional roots in property law and reasoned that Mr. Jones had been searched because the Government physically trespassed on his bailment interest in his wife's vehicle for the purpose of obtaining information.  *Jones*, 565 U.S. at 404 & n.2, 405.  The length of the surveillance, twenty-eight days, played no part in the holding.  *See id.* at 412–13.  As a result, district courts still possess scant and

contradictory guidance as to whether *non-trespassory* GPS vehicle monitoring, as in this case of a borrowed truck, is an unreasonable search under the Fourth Amendment.

2.

To understand this quandary, it is helpful to first look to the history and original meaning of the Fourth Amendment, then to recent developments. The Fourth Amendment was drafted and ratified to prevent threats to individual liberty that were well-known at the founding: intrusions by government officers into private property. In the late-eighteenth century, these intrusions included general warrants and writs of assistance. *Carpenter v. United States*, 138 S. Ct. 2206, 2264 (2018) (Gorsuch, J., dissenting). General warrants failed to identify the person or place to be searched or the evidence that was being sought, and writs of assistance gave customs officials "carte blanche to access ships, warehouses, and homes, and all persons, papers, and effects contained therein" with the forced assistance of nearby laymen. Laura K. Donahue, *The Original Fourth Amendment*, 83 U. CHI. L. REV. 1181, 1207–08, 1242–44 (2016).

With these evils in mind, the Fourth Amendment's drafters protected Americans from unreasonable searches in particular classes of property. "When the Fourth Amendment was adopted, as now, to 'search' meant 'to look over or through for the purpose of finding something; to explore; to examine by inspection; as, to

*search* the house for a book; to *search* the wood for a thief.'" *Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001) (emphasis in original) (quoting NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 66 (reprint 6th ed. 1989) (1828)); *see also Carpenter*, 138 S. Ct. at 2238 (Thomas, J., dissenting) (collecting other founding-era definitions). "By connecting the right to be secure to these four specific objects,"—persons, houses, papers, and effects—"[t]he text of the Fourth Amendment reflects its close connection to property." *Carpenter*, 138 S. Ct. at 2239 (Thomas, J., dissenting) (internal quotation marks omitted) (quoting *Jones*, 565 U.S. at 405).

This history motivated the *Jones* majority in 2012. *See Jones*, 565 U.S. at 404–405. If property rights were the only Fourth Amendment yardstick, this motion to suppress could be easily dismissed. The police did not commit a trespass to chattel because they attached the GPS device to the truck with the owner's consent before Mr. Howard borrowed it. *See id.* at 425 (Alito, J., dissenting) ("[A] bailee may sue for a trespass to chattel only if the injury occurs during the term of the bailment. So if the GPS device had been installed before [the owner] gave him the keys, respondent would have no claim for trespass—and, presumably, no Fourth Amendment claim either." (internal citation omitted)).

However, in 1967, the Court pivoted away from notions of property and toward notions of privacy. When confronted with the thorny issue of how to apply

the Fourth Amendment to wiretapping accomplished without physical intrusion into the target's person, house, papers, or effects, the Court declared that the "reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure." *Katz*, 389 U.S. at 353. Justice Harlan's concurrence in *Katz* suggested a new "twofold requirement" to establish Fourth Amendment protection: "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Id*. at 361 (Harlan, J., concurring). That test became the "lodestar" of Fourth Amendment analysis. *Smith*, 442 U.S. at 749. "Over time, the Court minimized the subjective prong of Justice Harlan's test. That left the objective prong—the 'reasonable expectation of privacy' test that the Court still applies today." *Carpenter*, 138 S. Ct. at 2238 (Thomas, J., dissenting) (citing Orin S. Kerr, Katz *Has Only One Step: The Irrelevance of Subjective Expectations*, 82 U. CHI. L. REV. 113 (2015)). "[R]ecent Fourth Amendment cases have clarified that the [*Katz*] test . . . supplements, rather than displaces, 'the traditional property-based understanding of the Fourth Amendment.'" *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) (internal citation omitted) (quoting *Florida v. Jardines*, 569 U. S. 1, 11 (2013)). Thus, beginning with *Jones* in 2012 and continuing through *Carpenter* in

2018, the property notion of trespass has been quickened.  It is getting harder and harder to tell the quick from the dead.[1]

3.

This court is not the only one left in the lurch by the present state of the law.

> Jurists and commentators tasked with deciphering [the Supreme Court's] jurisprudence have described the *Katz* regime as "an unpredictable jumble," "a mass of contradictions and obscurities," "all over the map," "riddled with inconsistency and incoherence," "a series of inconsistent and bizarre results that [the Court] has left entirely undefended," "unstable," "chameleon-like," "'notoriously unhelpful,'" "a conclusion rather than a starting point for analysis," "distressingly unmanageable," "a dismal failure," "flawed to the core," "unadorned fiat," and "inspired by the kind of logic that produced Rube Goldberg's bizarre contraptions."

*Carpenter*, 138 S. Ct. at 2244 (Thomas, J., dissenting) (internal citations omitted).

Lest one thinks this lack of guidance is by accident, the Supreme Court noted last year in *Carpenter* that "no single rubric definitively resolves which expectations of privacy are entitled to protection." *Id.* at 2213–14 (majority opinion).  "But then it offer[ed] a twist.  Lower courts should be sure to add two special principles to their *Katz* calculus: the need to avoid 'arbitrary power' and the importance of "plac[ing] obstacles in the way of a too permeating police surveillance.'" *Id.* at 2266 (Gorsuch, J., dissenting) (internal quotation marks omitted) (quoting *id*. at 2214 (majority

---

[1]  This phrase was coined by Circuit Judge (Ret.) Truman M. Hobbs, Jr., of Montgomery, Alabama.

opinion)). According to Justice Gorsuch at least, *Katz* is now burdened with the revival of traditional trespass analysis *plus* these two special principles.

"While surely laudable, these principles don't offer" a court "much guidance." *Id.* The Supreme Court has not provided instruction as to "how far to carry either principle or how to weigh them against the legitimate needs of law enforcement." *Id.* One does not know at what point "access to electronic data amount[s] to 'arbitrary' authority" or when "police surveillance become[s] 'too permeating.'" *Id.* "And what sort of 'obstacles' should judges 'place' in law enforcement's path when it does?" *Id.* Answers evade analysis. Consequently, one is "left with two amorphous balancing tests, a series of weighty and incommensurable principles to consider in them, and a few illustrative examples that seem little more than the product of judicial intuition." *Id.* at 2267.

4.

With this "guidance" in mind, some specific illustrative examples inform this case. On the one hand, the Court's holding in *United States v. Knotts* permits the use of a beeper to follow a vehicle because "'[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." 460 U.S. 276, 281 (1983).

> Police officers in that case planted a beeper in a container of chloroform before it was purchased by one of Knotts's co-conspirators. The officers (with intermittent aerial assistance) then followed the automobile carrying the container from Minneapolis to Knotts's cabin

in Wisconsin, relying on the beeper's signal to help keep the vehicle in view. The Court concluded that the "augment[ed]" visual surveillance did not constitute a search because "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." Since the movements of the vehicle and its final destination had been "voluntarily conveyed to anyone who wanted to look," Knotts could not assert a privacy interest in the information obtained.

*Carpenter*, 138 S. Ct. at 2215 (quoting *Knotts*, 460 U.S. at 281–82) (internal citations omitted). On the other hand, the Court's recent holding in *Carpenter v. United States* forbids the Government from warrantlessly accessing seven days of historical cell-site location information ("CSLI") from a target's wireless carriers because a person has a "reasonable expectation of privacy in the whole of his physical movements."[2] *Id*. at 2219.

Each case attempted to limit its own construction. The *Knotts* Court noted the "limited use which the government made of the signals from this particular beeper" during a discrete "automotive journey" and reserved the question of whether "different constitutional principles may be applicable" if "twenty-four hour surveillance of any citizen of this country [were] possible." *Knotts*, 460 U.S. at 283–85 (internal quotation marks omitted). In *Carpenter*, the Court explicitly refused to

---

[2] The majority in *Carpenter* attempted a curious sort-of rewrite of *Jones* by stating, "Three decades later, the Court considered more sophisticated surveillance of the sort envisioned in *Knotts* and found that different principles did indeed apply. In *United States v. Jones*, . . . five Justices agreed that related privacy concerns would be raised by, for example, 'surreptitiously activating a stolen vehicle detection system' in Jones's car to track Jones himself, or conducting GPS tracking of his cell phone." *Id*. at 2215 (quoting *Jones*, 565 U.S. at 426 (Alito, J., concurring)). However, this dictum does not rewrite the reasoning on which *Jones* actually rests.

answer whether one's "reasonable expectation of privacy in the whole of his physical movements" extends to shorter periods of time or to other location tracking devices. *Carpenter*, 138 S. Ct. at 2217 n.3, 2220. Courts like this one are left to decide just how long is a piece of string.

5.

Four Supreme Court justices, the D.C. Circuit, and the Sixth Circuit have endorsed an idea that could reconcile these disparate holdings under a mosaic theory of electronic location tracking. "Under this approach, relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable. But the use of longer term GPS monitoring," thus enabling the creation of a detailed mosaic of a person's life, "in the investigations of most offenses impinges on expectations of privacy." *Jones*, 565 U.S. at 430 (Alito, J., concurring) (internal citation omitted); *see also* Orin S. Kerr, *Implementing* Carpenter 35 (discussion draft excerpted from THE DIGITAL FOURTH AMENDMENT (forthcoming), 2018), https://ssrn.com/abstract=3301257 ("The idea of the mosaic theory is to treat short-term or limited records collection differently than long-term or broad records collection. Limited collection is not a search, but surveillance that goes on too long crosses a line and triggers the Fourth Amendment.").

This departure from the long-standing sequential approach to analyzing searches is purportedly justified because long-term surveillance uncovers "types of information not revealed by short-term surveillance, such as what a person does repeatedly, what he does not do, and what he does ensemble. . . . Repeated visits to a church, a gym, a bar, or a bookie tell a story not told by any single visit . . . ." *United States v. Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010), *aff'd sub nom. United States v. Jones*, 565 U.S. 400 (2012); *see also United States v. Skinner*, 690 F.3d 772, 780–81 (6th Cir. 2012) (holding that three days of real-time, non-trespassory cell phone tracking did not "present the concern raised by Justice Alito's concurrence in *Jones*"), *superseded by sentencing guidelines on other grounds*, U.S. Sentencing Guidelines Manual App. C, amend. 794, at 116-18 (Nov. 2015); *United States v. Diggs*, 385 F. Supp. 3d 648, 652, 654–55 (N.D. Ill. 2019) (relying on *Carpenter* and the *Jones* concurrences to find that warrantless acquisition of one month of *historical* GPS vehicle data violated the target's "reasonable expectation of privacy in the GPS data [that] arises from the story that data tells about his movements over the course of a month"); *State v. Zahn*, 812 N.W.2d 490, 497–98 (S.D. 2012) (adopting the mosaic theory and holding that twenty-six days of warrantless GPS vehicle tracking violated reasonable expectations of privacy).

The idea that constitutionality could hinge on the duration of a "search" has puzzled a Supreme Court justice,[3] several circuit judges,[4] three district courts,[5] two state

---

[3] *Carpenter*, 138 S. Ct. at 2266–67 (Gorsuch, J., dissenting) ("The Court declines to say whether there is any sufficiently limited period of time 'for which the Government may obtain an individual's historical [location information] free from Fourth Amendment scrutiny.' But then it tells us that access to seven days' worth of information *does* trigger Fourth Amendment scrutiny—even though here the carrier 'produced only two days of records.' Why is the relevant fact the seven days of information the government *asked for* instead of the two days of information the government *actually saw*? Why seven days instead of ten or three or one?" (emphasis in original) (internal citations omitted)).

[4] *United States v. Cuevas-Perez*, 640 F.3d 272, 279, 283–84 (7th Cir. 2011) (Flaum, J., concurring) (stating, in a case involving sixty hours of trespassory GPS vehicle monitoring, "It is difficult to see—based on the case law we have—how aggregating a nullity over a longer time period, or for more trips, yields an expectation of privacy. . . . [T]he fact that law enforcement are able to take information that is revealed publicly and piece together an intimate picture of someone's life does not raise constitutional concerns under current doctrine. . . . Moreover, the mosaic approach . . . would prove unworkable. Law enforcement—at some point—would have to stop looking at that which is publicly exposed. But how can one discern the point before the fact? I do not see how . . . ."), *vacated*, 565 U.S. 1189 (2012) (vacating the case because it involved physical trespass); *United States v. Jones*, 625 F.3d 766, 769 (2010) (Sentelle, J., dissenting) ("The reasonable expectation of privacy as to a person's movements on the highway is, as concluded in *Knotts*, zero. The sum of an infinite number of zero-value parts is also zero."), *denying reh'g en banc sub nom. United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010). *But see Cuevas-Perez*, 640 F.3d at 294–95 (Wood, J., dissenting) (arguing that the underlying rationale for the mosaic theory justifies requiring a warrant for *any amount* of location data).

[5] *United States v. Mazzara*, No. 16 CR. 576 (KBF), 2017 WL 4862793, at *27–28 (S.D.N.Y. Oct. 27, 2017) (rejecting the application of the mosaic theory to twenty-one months of pole camera surveillance because "there is no controlling case law that suggests the quantum or type of information collected during otherwise lawful surveillance somehow renders that surveillance unconstitutional"), *aff'd on other grounds sub nom. United States v. Kerrigan*, No. 18-1022-cr, 2019 U.S. App. LEXIS 27705 (2d. Cir. Sept. 12, 2019); *United States v. Graham*, 846 F. Supp. 2d 384, 401, 403 (D. Md. 2012) (noting that "the law as it now stands simply does not contemplate a situation whereby traditional surveillance becomes a Fourth Amendment 'search' only after some specified period of time—discrete acts of law enforcement are either constitutional or they are not," and finding that CSLI is not protected pre-*Carpenter* due to the third-party doctrine), *aff'd*, 824 F.3d 421 (4th Cir. 2016) (en banc); *United States v. Sparks*, 750 F. Supp. 2d 384, 391–93 (D. Mass. 2010) (rejecting mosaic theory in a trespassory GPS vehicle tracking case post-*Maynard* but pre-*Jones*, and finding that *Knotts* controls the question of GPS monitoring), *aff'd on other grounds*, 711 F.3d 58 (1st Cir. 2013).

supreme courts,[6] and one of the nation's leading Fourth Amendment scholars.[7] They

have suggested that mosaic theory lacks a doctrinal foundation, is unworkable in

practice, requires arbitrary line-drawing best left to legislatures, and fails to provide

clear guidance to law enforcement agencies.

---

[6] *State v. Jean*, 407 P.3d 524, 532–33 (Ariz. 2018) (concluding that "[n]ot only is there no analytical basis to distinguish between longer and shorter-term GPS monitoring for purposes of determining if a search has occurred, but such a distinction would also fail to provide clear guidance to law enforcement for when a warrant is required," and distinguishing *Knotts* to find that GPS vehicle tracking is always a search), *cert. denied*, 138 S. Ct. 2626 (2018); *Tracey v. State*, 152 So. 3d 504, 520, 526 (Fla. 2014) (holding that "basing the determination as to whether warrantless real-time cell site location tracking violates the Fourth Amendment on the length of the time the cell phone is monitored is not a workable analysis," and finding that probable cause is required to access such information).

[7] Professor Orin Kerr has repeatedly argued that the mosaic theory is a dramatic departure from traditional Fourth Amendment doctrine, is unworkable in practice, requires judges to make arbitrary distinctions that "seem embarrassingly legislative," and fails to provide clear guidance to law enforcement agencies. Orin S. Kerr, *The Mosaic Theory of the Fourth Amendment*, 111 MICH. L. REV. 311 (2012); Orin S. Kerr, *Implementing* Carpenter 37–39 (discussion draft excerpted from THE DIGITAL FOURTH AMENDMENT (forthcoming), 2018), https://ssrn.com/abstract=3301257. Proponents of the mosaic theory generally respond that the theory reflects the reality that aggregated data is more than the sum of its parts, that big data has reset the balance between state and citizenry, and that courts are capable of seemingly arbitrary line-drawing. Paul Rosenzweig, *In Defense of the Mosaic Theory*, LAWFARE (Nov. 29, 2017, 3:18 PM), https://www.lawfareblog.com/defense-mosaic-theory [https://perma.cc/RYX5-DUVS]; *see also* Priscilla J. Smith et al., *When Machines Are Watching: How Warrantless Use of GPS Surveillance Technology Violates the Fourth Amendment Right Against Unreasonable Searches*, 121 YALE L.J. ONLINE 177, 201 (2011), https://www.yalelawjournal.org/forum/when-machines-are-watching-how-warrantless-use-of-gps-surveillance-technology-violates-the-fourth-amendment-right-against-unreasonable-searches [https://perma.cc/7937-NVHE] ("There may indeed be tough decisions for courts to make about whether limited use of GPS surveillance (e.g., tracking a suspect for a single day) triggers the Fourth Amendment warrant requirement. But this is why we have judges, and they will use all the criteria they apply to other surveillance situations . . . here."); Brief for Yale Law School Information Society Project Scholars and Other Experts in the Law of Privacy and Technology as Amici Curiae Supporting Respondent at 25–27, *Jones*, 565 U.S. 400 (No. 10-1259), 2011 WL 4614429 (arguing that a "rule requiring judges to decide when GPS surveillance is 'prolonged' would not lead to judicial confusion and inconsistency").

6.

In the end, the GPS monitoring in this case was not a search, a conclusion that does not rest on the mosaic theory. Instead, the finding is grounded in the fundamentals of the relevant facts and applicable law. First, there was no trespass; the truck was borrowed, and it came equipped with an owner-approved option: GPS tracking. Second, the surveillance was not for an "extended period of time." *Jones*, 565 U.S. at 418 (Alito, J., concurring). Mr. Howard was monitored during a discreet trip over a twenty-two-hour period with a two-way distance of approximately two-hundred miles. The officers had a short, same-day window to decide whether to install the GPS device, secure the owner's consent, install the device, and ensure Mr. Howard received the truck. They had to do all of this without arousing suspicion, and all for a single out-and-back journey. These trip characteristics fall easily within the province of *Knotts*.

Third, GPS is not the technological equivalent of CSLI. A GPS is a "grown up" beeper, both of which can be distinguished technologically from CSLI. While one is satellite based and one is radio based, both provide real-time location monitoring.[8] As acknowledged in *Carpenter*, CSLI is more intrusive than GPS vehicle monitoring because it is retrospective and can track cell phone holders into

---

[8] As do older technological advances such as field glasses (binoculars) and marine search lights. *See United States v. Lee*, 274 U.S. 559, 563 (1927).

constitutionally protected places. The retrospective quality of CSLI divides what could be done by traditional, visual surveillance from what could not because "[i]n the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection." *Carpenter*, 138 S. Ct. at 2218. Both today and at the founding, police could track an identified suspect in real time. They could even do so without keeping constant eyes on their suspect. If a constable in 1789 received consent to exchange the wheels on a stagecoach with ones that leave a distinctive marking on the road before the coach was to be borrowed by a smuggler, he or she could wait hours before following the tracks to his target. However, no constable could discover his or her target's name, and then "travel back in time to retrace [that] person's whereabouts." *See id.* "Unlike with the GPS device in *Jones*," with CSLI, "police need not even know in advance whether they want to follow a particular individual, or when." *Id.*; *see also Diggs*, 385 F. Supp. at 652 (noting that the retrospective quality of historical GPS vehicle data "impinges even further on privacy concerns than did the live data in *Jones*").

Cell phones also differ from vehicles in their capacity to "track[] nearly exactly the movements of its owner. While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time." *Id.* Cell phones also follow their owners into homes and other constitutionally protected spaces, wherein monitoring them violates Supreme Court precedent. *See United*

*States v. Karo*, 468 U.S. 705, 714 (1984) (holding that "the monitoring of a beeper in a private residence, a location not open to visual surveillance, violates the Fourth Amendment rights of those who have a justifiable interest in the privacy of the residence"); *see also Carpenter*, 138 S. Ct. at 2218 ("A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales.").

While not a perfect fit, this case is more factually analogous to *Knotts*. Even though Mr. Howard made several stops, he has not argued that the truck was ever located where the police could not have legally observed it. *Compare Knotts*, 460 U.S. at 281–82 (holding that monitoring a beeper sitting in a car that is in public view is constitutional), *with Karo*, 468 U.S. at 714 (holding that monitoring a beeper that has been taken into a home is unconstitutional). That Investigator Tye chose not to observe the truck is presently irrelevant. "It may be that achieving the same result through electronic means, without an accompanying trespass, is an unconstitutional invasion of privacy," *Jones*, 565 U.S. at 412, but neither the Supreme Court nor the Eleventh Circuit has yet held as much. So long as *Knotts* is the law, the court declines to answer that question in the affirmative.

Finally, this conclusion is grounded in the much older principles of *stare decisis*. *Carpenter*'s seemingly sweeping language and its two new principles, *Carpenter*, 138 S. Ct. at 2214, may signal the Supreme Court's willingness to revisit

*Knotts*, but the Court has not explicitly overruled *Knotts*. Its "decisions remain binding precedent until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Hohn v. United States*, 524 U.S. 236, 252–53 (1998). If a Supreme Court precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," the lower court "should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). "The problem with lower courts basing decisions on predictions that the Supreme Court will overturn one of its own decisions is that the Supreme Court has repeatedly told us not to do it." *United States v. Greer*, 440 F.3d 1267, 1275 (11th Cir. 2006) (collecting cases relaying this command). The court "take[s] that admonition seriously." *Id.* at 1276. Because *Knotts* is more factually analogous than *Carpenter*, *Knotts* controls this finding.

Considering these distinctions, a full-scale *Katz* evaluation of these facts is not warranted. Their import has already been decided. While different facts may someday call for a different analytical lens, "the fact" here "is that the 'reality hardly suggests abuse.'" *Knotts*, 460 U.S. at 284 (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 566 (1978)). Until a higher court dictates that "achieving the same result" as extended visual observation "through electronic means, without an accompanying

trespass, is an unconstitutional invasion of privacy," *see id.*, this court is bound to follow *Knotts* and hold that no search occurred within the meaning of the Fourth Amendment.[9]

## B. Investigator Tye had reasonable suspicion to stop Mr. Howard on February 22, 2018.

Mr. Howard has objected to the Recommendation's finding that the vehicle stop by Investigator Tye on February 22, 2018, was supported by reasonable suspicion of criminal activity. That objection is due to be overruled, and the Recommendation is due to be adopted with modification.

The Recommendation's legal and factual analysis of Investigator Tye's basis for reasonable suspicion is sound and will be briefly summarized for clarity. (Doc. # 50, at 15–19.) Under *Terry v. Ohio*, a law enforcement agent may conduct a traffic stop if he or she has reasonable suspicion of criminal activity. 392 U.S. 1, 30 (1968). When determining whether the totality of the circumstances establishes reasonable suspicion, a court considers the following factors: corroboration of the details of the tip through independent police work; whether the informant has made a statement against his penal interests; whether the informant had personal knowledge; and

---

[9] That this search is presently found to be permissible, does not make it advisable. Law enforcement would be well-advised to avoid the risk illustrated in this case by getting a warrant before it engages in GPS vehicle tracking.

whether there is a past history between the informant and the police department that supports his reliability. *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996).

The Recommendation analogized this case to the facts of *Alabama v. White*, 496 U.S. 325 (1990). In that case, "police received an anonymous telephone tip that the defendant would be leaving an apartment complex at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's Motel, and that she would have one ounce of cocaine in a brown attache case." (Doc. # 50, at 17 (citing *White*, 496 U.S. at 327).) Police watched the defendant leave that apartment complex with nothing in her hands and drive the described vehicle toward the motel. *White*, 496 U.S. at 327. Police stopped the defendant near the motel. *Id.* The Court concluded that the officers had reasonable suspicion because the caller correctly predicted the time and direction of the defendant's travel and because the officers independently confirmed those facts. *Id.* at 331–32.

"As in *White*, the CI predicted the approximate time Howard would be leaving, the vehicle he would be driving, and his destination." (Doc. # 50, at 18.) These details and the fact that Howard was borrowing the CI's own vehicle indicate that she had personal knowledge about the purpose of his trip. "Additionally, police were able to investigate the tip and independently corroborate that Howard was driving the CI's vehicle to Phenix City through the use of GPS surveillance and

visual surveillance once Howard returned to town." (Doc. # 50, at 18.) This suffices as a basis for reasonable suspicion. (*See* Doc. # 50, at 18–19 (collecting additional supportive cases).)

But the analysis is modified to acknowledge the presence of a second confidential informant. (Doc. # 50, at 2.) This investigation began when Corporal Krabbe, Investigator Tye's superior, received a tip from his own confidential informant that Mr. Howard "was possibly traveling to Phenix City that day or that night to pick up a large amount of methamphetamine." (Doc. # 42, at 4–5, 37); (Doc. # 38, Def. Ex. 2, at 1.) This tip prompted Investigator Tye's call to the other CI who loaned Mr. Howard the truck. (Doc. # 42, at 4–5, 37.) While the record does not provide any information as to Corporal Krabbe's CI's history with law enforcement or his or her motivations, that CI's tip does add to the foundation for reasonable suspicion. For the reasons stated here and in the Recommendation, Investigator Tye had a reasonable suspicion of criminal activity when he stopped Mr. Howard's truck.

Additionally, Mr. Howard's objections raise some factually unsupported claims that are worth correcting. First, Mr. Howard asserts that "it appears that the alleged agreement for Mr. Howard to travel to Phenix City was orchestrated by the C[I]." (Doc. # 61, at 11.) Mr. Howard cites no evidence in the record that supports this assertion, and the evidence that is in the record suggests that Mr. Howard made this plan before he asked Investigator Tye's CI for her truck. (Doc. # 42, at 4–5, 8,

27, 37–38.)  Second, Mr. Howard asserts that "[t]here is no evidence on the record that supports that the C[I] had personal knowledge that Mr. Howard was distributing methamphetamine."  (Doc. # 61, at 12.)  The record belies this assertion.  According to Investigator Tye, his CI "stated she was familiar with [Mr. Howard] and that he did sell methamphetamine.  The amount that Corporal [Krabbe] had been told was a lot larger than what she knew him to be dealing with."  (Doc. # 42, at 8–9.)  Thus, this objection fails.

## C.  Corporal Overstreet had probable cause to believe that Mr. Howard committed a traffic violation on July 13, 2018.

Mr. Howard objects to the Magistrate Judge's finding that he committed a traffic violation that would justify his July 13, 2018 stop.  (Doc. # 61, at 14–15.) Upon review of the dashboard camera video (Doc. # 38, Def. Ex. # 5), the court finds that Mr. Howard did cross a double-yellow line in violation of Code of Alabama § 32-5A-88(2) ("Upon a roadway which is divided into three lanes and provides for two-way movement of traffic, a vehicle shall not be driven in the center lane except . . . in preparation for making a left turn or where such center lane is at the time allocated exclusively to traffic moving in the same direction that the vehicle is proceeding and such allocation is designated by official traffic-control devices."). Corporal Overstreet had probable cause to believe a traffic violation had occurred.[10]

---

[10] The Recommendation imprecisely relays the state of the law on this issue.  (Doc. # 50, at 6) ("Investigative stops that fall short of arrests . . . are 'constitutional if [they are] *either* based

Therefore, the Recommendation's findings of fact and conclusions of law relating to the July 13, 2018 traffic stop (Doc. # 50, at 5–7) are due to be adopted.

## IV.  CONCLUSION

For these reasons, the GPS tracking of Mr. Howard's borrowed vehicle was not a search and did not violate his Fourth Amendment rights.  Mr. Howard's Fourth Amendment rights were not violated during his February 22, and July 13, 2018 traffic stops.  The Recommendation is therefore adopted with modifications, and Defendant's motion to suppress is denied.

It is ORDERED as follows:

1.      The Magistrate Judge's Recommendation (Doc. # 50) is ADOPTED as MODIFIED herein;

2.      Defendant's objections (Doc. # 61) are OVERRULED; and

3.      Defendant's motion to suppress (Doc. # 28) is DENIED.

DONE this 15th day of November, 2019.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE

---

upon probable cause to believe a traffic violation has occurred *or* justified by reasonable suspicion as set forth in *Terry*.'  Even a minor traffic violation can constitute the criminal activity required for reasonable suspicion." (internal citations omitted) (quoting *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008) (per curiam)).)  However, "the Supreme Court has since made it plain that reasonable suspicion [to believe that a traffic violation has occurred] is all that is required." *United States v. Meko*, 912 F.3d 1340, 1349 n.9 (11th Cir. 2019), *cert. denied*, No. 18-9631, 2019 WL 4922214 (Oct. 7, 2019).